
COURT EXHIBIT
1
10-cr-00369

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 10-cr-00369-WYD

UNITED STATES OF AMERICA,

 Plaintiff,

v.

1. GEORGIOS SGOUROS,

 Defendant.

---

**PLEA AGREEMENT AND STATEMENT OF FACTS
RELEVANT TO SENTENCING**

---

The United States of America, by and through Judith A. Smith, Assistant United States Attorney, and defendant, GEORGIOS SGOUROS, personally and through counsel, Thomas E. Goodreid, submit the following Plea Agreement and Statement of Facts Relevant to Sentencing pursuant to Fed. R. Crim. P. 11(c)(1)(B) and D.C.COLO.LCrR 11.1.

### I. PLEA AGREEMENT

A. **Agreement of the Parties**: The defendant agrees to plead guilty to count one of the Indictment, which charges a violation of 18 U.S.C. § 2423(b), Travel With Intent to Engage in Illicit Sexual Conduct. Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the parties agree to recommend a sentence of 120 months imprisonment to the Court. If the defendant engages in no conduct that otherwise implicates § 3C1.1, the government agrees that a 3 point reduction in the offense level for acceptance of responsibility is appropriate and agrees to make the appropriate motion at sentencing. The parties also agree to recommend a downward variance pursuant to 18

U.S.C. § 3553(a) to reach a sentence of 120 months; such a variance closely represents a one-level downward adjustment to the adjusted offense level under the United States Sentencing Guidelines. The government agrees to recommend this downward variance in consideration of the defendant's agreement to waive his appellate rights as discussed below. Upon the defendant's sentencing pursuant to this agreement, the government agrees to dismiss the remaining counts in the indictment.

### B. Defendant's Waiver of Appeal

Because the defendant has recently agreed to a waiver of his appellate rights, the government believes, as explained below, that the defendant's waiver of his appeal rights in this unique situation warrants a downward variance to a sentence of 120 months imprisonment under 18 U.S.C. § 3553(a).

The defendant is aware that 18 U.S.C. § 3742 affords a defendant the right to appeal the sentence imposed. Understanding this and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence unless it meets one of the following three criteria: (1) the sentence imposed is above the maximum penalty provided in the statute of conviction, (2) the Court, after determining the otherwise applicable sentencing guideline range, either departs or varies upwardly, or (3) the Court imposes a sentence greater than 120 months imprisonment. Except as provided above, the defendant also knowingly and voluntarily waives the right to appeal the manner in which the sentence is determined on grounds set forth in 18 U.S.C. § 3742. The defendant also knowingly and voluntarily waives his right to challenge this prosecution, conviction, or sentence and/or the manner in which it was determined

in any collateral attack, including but not limited to a motion brought under 28 U.S.C. § 2255. This waiver provision, however, will not prevent the defendant from seeking relief otherwise available if: (1) there is an explicitly retroactive change in the applicable guidelines or sentencing statute, (2) there is a claim that the defendant was denied the effective assistance of counsel, or (3) there is a claim of prosecutorial misconduct. Additionally, if the government appeals the sentence imposed by the Court, the defendant is released from this waiver provision.

## II. PENALTIES

### A. Statutory Penalties

The applicable maximum statutory penalty for a violation of 18 U.S.C. § 2423(b) is not more than 30 years imprisonment, not more than $250,000 fine, or both. Pursuant to 18 U.S.C.§ 3583(k), because the Defendant is pleading guilty to violating 18 U.S.C. § 2423(b), the term of supervised release is not less than 5 years and up to a term of life. Defendant will also be required to pay a $100 special assessment fee.

A violation of the conditions of probation or supervised release may result in a separate prison sentence. If a condition of release is violated, the defendant may be sentenced to up to three years without credit for pre-release imprisonment or time previously served on post-release supervision; if the defendant commits any criminal offense under Chapter 109A, 110, or 117, or Title 18, United States Code, Sections 1201 or 1591, for which imprisonment for a term longer than 1 year can be imposed, the defendant shall be sentenced to not less than 5 years and up to the maximum term of imprisonment for the offense, as set forth above.

B.   **Collateral Consequences**

The conviction may cause the loss of civil rights, including but not limited to the right to possess firearms, vote, hold elected office, and to serve on a jury. Since the defendant is not a United States citizen, this conviction will result in the defendant's removal from the United States once he has completed any sentence of imprisonment. If for any reason the defendant is not removed from the United States once he has completed any sentence of imprisonment, the

The defendant has been advised and he understands that under the Sex Offender Registration and Notification Act, a federal law, and pursuant to 18 U.S.C. § 3583(d), upon his release from prison and as a condition of his supervised release, if any, he will be subject to federal and state sex offender registration requirements, and that those requirements may apply throughout his life. The defendant understands he must register as a sex offender and must keep the registration current with the state sex offender registration agency in each of the following jurisdictions: where he was convicted, where he resides, where he is employed, and where he is a student. The defendant understands that the requirements for registration include providing his name, residence address, and the names and addresses of any places where he is or will be an employee or a student, among other information. The defendant further understands that the requirement to keep the registration current includes informing at least one jurisdiction in which he resides, is an employee, or is a student not later than three business days after any change of name, residence, employment, or student status. The defendant shall comply with requirements to periodically verify in person his sex offender registration information. The defendant has been advised, and understands, that failure to comply with these obligations subjects him to prosecution for violations of applicable state law or 18 U.S.C. § 2250, a federal law, which is punishable by a

4

fine or imprisonment, or both. Defendant further understands that, under 18 U.S.C. § 4042(c), notice will be provided to certain law enforcement agencies upon release from confinement following conviction. Defendant shall provide proof of registration to the Probation Officer within 72 hours of release from imprisonment.

Because the defendant is not a U.S. citizen, and is a citizen of Greece, he may exercise his rights under U.S. law and international treaty to apply for permission to transfer so that he may serve his prison sentence in his native country of Greece. If Greece, the "administering State" pursuant to The Council of Europe Convention on the Transfer of Sentenced Persons ("Convention"), and 18 U.S.C. § 4100 *et. seq*, agrees that it will continue its enforcement of the sentence that this Court imposes, and agrees to be bound by the legal nature and duration of this Court's sentence pursuant to Article 9(1)(a) and Article 10(1) of the Convention, the United States Attorney's Office for the District of Colorado agrees to recommend defendant's transfer of defendant to Greece.

### III. STATUTORY ELEMENTS

In order to sustain its burden of proof for the crime of travel with intent to engage in illicit sexual conduct, as charged in Count One of the Indictment, the government must prove the following elements beyond a reasonable doubt:

*First*: That the defendant traveled in interstate or foreign commerce; and

*Second*: That the defendant's purpose in traveling in interstate or foreign commerce was to engage in illicit sexual conduct with another person. 18 U.S.C. § 2423(b).[1]

---

[1] It is not necessary for the government to prove that a criminal sexual act was the sole purpose for a defendant traveling from one state to another, but the Government must prove that it was a dominant purpose, as opposed to an incidental one. *United States v. Meacham*, 115 F.3d 1488, 1495 (10th Cir. 1997).

The term "illicit sexual conduct" means "a sexual act (as defined in section 2246) with a person under 18 years of age that would be a violation of chapter 109A if the sexual act occurred in the special maritime and territorial jurisdiction of the United States." 18 U.S.C. § 2423(f). The term "sexual act" means:

(A) contact between the penis and the vulva or the penis and the anus, and for purposes of this subparagraph contact involving the penis occurs upon penetration, however, slight;

(B) contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus;

(C) the penetration, however, slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person; or

(D) the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person. 18 U.S.C. § 2246(2)(A)-(D).

It is a violation of chapter 109A, to cross a State line with intent to engage in a sexual act with a person who has not attained the age of 12 years. 18 U.S.C. § 2241(c).

## IV. STIPULATION OF FACTUAL BASIS AND FACTS RELEVANT TO SENTENCING

The parties agree that there is no dispute as to the material elements which establish a factual basis of the offense of conviction. Pertinent facts are set out below in order to provide a factual basis of the plea and to provide facts which the parties believe are relevant, pursuant to § 1B1.3, for computing the appropriate guideline range. To the extent the parties disagree about

the facts relevant to sentencing, the statement of facts identifies which facts are known to be in dispute at the time of the plea. § 6B1.4(b).

The statement of facts herein does not preclude either party from presenting and arguing, for sentencing purposes, additional facts or factors not included herein which are relevant to the guideline computation (§ 1B1.3) or to sentencing in general (U.S.S.G. § 1B1.4; 18 U.S.C. § 3553(a)); however, the parties have agreed to seek a sentence of 120 months imprisonment. In "determining the factual basis for the sentence, the Court will consider the stipulation of the parties, together with the results of the presentence investigation, and any other relevant information." §6B1.4 Comm.

The parties agree that the government's evidence would be:

On January 28, 2010, United States Immigration and Customs Enforcement (ICE) Special Agent (SA) Melissa Coffey was in an undercover capacity as a single mother ("Jen") with two children, ages 5 and 7 years old, on the internet using a chat feature called Internet Relay Chat (IRC). Using the nickname "davviddd," the defendant initiated a private conversation with the undercover agent (UCA). The case agent noticed the defendant was in the following chat rooms: "#0!!!!!!!!dad&daughtersex", "#0!!!!!!girlswhosuckcock", "#0!!!!!!!!!!younggirlsex" and "#0!!!!!!!!!!Kids'R'us". An excerpt from the chat session appears below:

                [16:18] <davviddd> hi
                [16:21] <mommy> hello
                [16:21] <davviddd> how are u ? age?
                [16:21] <mommy> 30/f 2 daus
                [16:22] <davviddd> oh nice
                [16:22] <davviddd> how old are they?
                [16:24] <mommy> 7 and 5
                [16:25] <davviddd> do u want a man teach them?

7

[16:27] <mommy> yes, that is why i am here
[16:28] <davviddd> oh good
[16:28] <davviddd> i must say i never tried that
[16:28] <davviddd> but want to try...
[16:28] <davviddd> do u ahve any pic of them?
[16:34] <davviddd> what want me to do if meet to them?
[16:34] <davviddd> licking fingering  fuck?
[16:35] <mommy> anything you want in reason...no marks
[16:35] <davviddd> good
[16:35] <davviddd> will uwatch?
[16:36] <mommy> yes, to make sure everything is going good
[16:36] <davviddd> good
[16:36] <davviddd> do u have husbant?
[16:36] <mommy> single
[16:36] <davviddd> ok
[16:36] <mommy> you married?
[16:36] <davviddd> so how can we fix the date?
[16:36] <davviddd> where can we meet?
[16:37] <davviddd> i am . but i am like div
[16:37] <davviddd> wife works in other town and think of divorce
[16:37] <mommy> a date for you to fuck my girls
[16:38] <davviddd> yes
[16:38] <mommy> where are you at?
[16:41] <davviddd> i am in athens
[16:41] <davviddd> u?
[16:42] <mommy> usa, can you fly here?
[16:42] <davviddd> sure
[16:42] <davviddd> can u also flight here if i pay the tickets?
[16:43] <mommy> it would be hard to travel with the girls. they are more comfortable in their own home.
[16:43] <davviddd> have u tried it before with others men?
[16:44] <mommy> no, i have been waiting until they were ready.  i am on here because i think they are ready.
[16:44] <davviddd> will they obey?
[16:44] <mommy> yes they will
[16:45] <davviddd> sure?
[16:45] <davviddd> what u will tell them about me?
[16:45] <mommy> i have been teaching them
[16:45] <davviddd> what u teach them?
[16:46] <mommy> to submit
[16:47] <davviddd> in which state are u ?
[16:47] <mommy> colorado
[16:47] <davviddd> where exactly i have to come?
[16:48] <mommy> to denver international airport. i could pick you up there,

[16:48] <davviddd> ok

During the remainder of the chat, defendant continues to discuss having sex with the two girls, and the two discuss logistics of where he will stay during his visit, and how they will meet up at the airport. On the same day, January 28, 2010, the UCA received an email from defendant who was using the email address giorgos4sl@yahoo.com. The email read (in part), "iam giorgos from athens", "i will try to come to denver for doing it as soon as possible", "email me". In subsequent emails, the UCA and the defendant exchanged pictures of themselves; the UCA was wearing a distinctive shirt, and the defendant was wearing a distinctive gold cross around his neck.

On February 2, 2010, the UCA received an email from defendant where he states: "i want a face pic of you please with them too if possible i want fuck them a lot....for sure....wishing i was with all u now..." On February 3, 2010, the defendant sent an email stating that "i want u keep open their holes and make them ready". On February 9, 2010, the UCA was connected to IRC when she noticed the defendant in the same chat channels as on January 28, 2010. During their chat, defendant discussed again meeting with "Jen" and having sex with her two daughters ages 5 and 7. He also asked "Jen" to touch and rub her 5 year-old's genitals. Excerpts from the chat session appear below:

```
15:53 <daviidd> u opening them and push me into their tight pusy
15:54 <daviidd> i wantlick togehter their pussys
15:54 <mommy> this is wonderful
15:54 <daviidd> i will push intaking their virginity
15:54 <mommy> i think all little girls need a man like you
15:55 <daviidd> ohh good
15:55 <daviidd> u will pull my dick out u will suck it making more hard and push t again inthem
15:55 <mommy> they will like it
```

9

```
15:56 <daviidd> mmm
15:56 <daviidd> it turns me so hot

16:05 <daviidd> i want u describe to me what udo and how she feels
16:05 <mommy> she is sleeping next to me on the couch
16:06 <daviidd> ok
16:06 <daviidd> what is she wearing?
16:07 <mommy> a tee shirt and underwear
16:07 <daviidd> ok
16:21 <daviidd> put her on desk now and suck her pussy
16:21 <mommy> ok
16:21 <daviidd> tell her i will suck her like this
16:21 <mommy> yes
16:21 <daviidd> ope her tight pusy
16:21 <daviidd> waht she is saying?
16:21 <mommy> she is just looking at me
16:22 <daviidd> ddi u tell her that iwill come and suckher also?
16:22 <daviidd> ask her if she wants me to put my dick in her pussy
16:22 <mommy> she said ok
16:22 <daviidd> and psh  1-2 fingers inher toshow her how it will be with my dick in
16:22 <daviidd> ohhh
16:23 <daviidd> what u do now?
16:23 <mommy> exactly what you said
16:23 <daviidd> open more herpussy
16:23 <daviidd> i will playmy tongue up and down in her pussy
16:24 <mommy> she likes tonguw
16:24 <daviidd> do so
16:24 <daviidd> mmm
16:24 <daviidd> finger an lick her ass too
16:24 <mommy> yes
16:25 <daviidd> she likes also?
16:25 <daviidd> in ass?
16:25 <mommy> YES
16:25 <daviidd> lick her pussy and push 2 fingers in her asss
16:25 <daviidd> deep in
16:25 <daviidd> like it is my dick
16:26 <daviidd> ok? 2 inher ass now?
16:26 <mommy> yes
16:26 <daviidd> mmm
16:27 <daviidd> she can handle them
16:27 <daviidd> deep in?
```

During the remainder of the chat, defendant continues to coach "Jen" on how to engage

in further sexual acts with her daughter including oral contact, and anal and vaginal digital penetration of the 5 year old. On February 12, 2010, the defendant was again in the same chat channels. The defendant engaged in an online chat where the defendant again coaches "Jen" to touch her daughters' genitals, and to engage in oral sex with them. He also discusses his desire to engage in oral, vaginal, and anal sex with the two girls. Excerpts of the chat are below:

```
15:27 <daviidd> good jen. keep them virgin for my dic... they will have it soon
15:28 <daviidd> push the both fingers intheir tight ass to now
15:28 <mommy> ok
15:28 <daviidd> with lots oil on ...   make them moan but do not hyrt them
15:29 <daviidd> push 2 fings all way in ass now
15:29 <mommy> ok
15:29 <daviidd> going in?
15:29 <daviidd> all  way in?
15:33 <daviidd> u think their ass is ready for my dick?

15:42 <daviidd> u will open them lube and push my dick into them
15:42 <daviidd> like u were fuckign them using my dick...
15:42 <mommy> ok
15:42 <daviidd> u will brake their hymen pushing my dick  deep in...
15:43 <mommy> yes
15:43 <daviidd> will u do it slowly or with one move?
15:43 <mommy> probably slowly
```

On February 22, 2010, the UCA received an email from the defendant wherein he states "i cannot wait fuck them in real…" and "i promise u i will come for them soon… keep them for me!" On February 23, 2010, the two engage in a chat; the defendant again discusses his desire to have sex with the two girls. He also discusses that they need to keep their actions private, and need to ensure that the girls will not tell anyone about their activities. On the same day, February 23, 2010, defendant emailed his mobile telephone number to the UCA. The UCA provided defendant with her telephone number.

On March 23, 2010, the UCA received an email from defendant wherein he encourages

the UCA to engage in oral sex with her daughters. On April 16, 2010, the UCA received an email from defendant. He states "i am sad coz u answer very late to my emails... i realy want come there the next weeks... i am so hot thinking of them... but we need to fix it... ok?" On April 21, 2010, the UCA received an email from defendant who states: "what happened to you... if u had answer to me emails and give me a phone number to fix the date i would have been there now with u doing them... did u change your mind? hope u answere me soon so as to fix dates tickets etc..." On April 30, 2010, the UCA received an email from defendant emailing his mobile telephone number again. Between March 16, 2010, and April 28, 2010, the defendant sent UCA approximately sixteen emails—the UCA responded to only two during that time frame.

On May 3, 2010, the UCA received a telephone call from the defendant using his mobile number. During the call, the defendant stated he wanted to arrange the dates to meet the UCA and her children. He asked about the kids' schedule. On May 7, 2010, the UCA and the defendant engage in an online chat. The UCA asks defendant: "what is the first thing you want to do with them when you arrive?" To which the defendant responds: "sleeping with them . . . and u . . . nude rubbing . . . fingering them together and if they can handle to take my cok in them . . . i think if i start doing them and u i wont want to leave them . . ." The defendant also suggested that the UCA could send her children to him for the summer, and he would return them to her at the beginning of the school year. When the UCA rejected that proposal he stated: "of course i do want and i will come in june." During the course of their online relationship, UCA made clear that she did not want to have sex with defendant.

On May 15, 2010, the UCA received an email from defendant stating he was coming to

Colorado on the 14th of June. On June 2, 2010, the UCA and defendant engaged in an online chat during which defendant stated he was looking for flights to Denver, and he asked to speak with the children. At the end of the chat the defendant states: "hope everything goes well. I do not want any troubles." He also asks: "are u sure they are ready?" and "they both want?" On June 14, 2010, the UCA received an email(s) from defendant in which he provided his travel itinerary from Athens, Greece to Denver, Colorado. The two agreed that "Jen" would be wearing the same shirt she wore in her picture, and would meet the defendant at baggage claim. On the next day, the defendant arrived in Colorado from Athens, Greece, at the Denver International Airport. He was wearing the same gold cross that he was wearing in his emailed picture. He approached the UCA, and hugged her. During that contact, the UCA placed a call to another female undercover agent posing as "Jen's" seven-year old daughter. The defendant spoke with the agent on the phone as though she were a child.

The defendant admits that he traveled in interstate or foreign commerce for the purpose of engaging in illicit sexual conduct with a child under the age of 12, and admits he used a computer to entice or solicit a person to engage in prohibited sexual conduct with a minor.

## V. SENTENCING COMPUTATION

The parties stipulate that sentencing in this case will be determined by application of the advisory sentencing guidelines, issued pursuant to Title 28, United States Code, Section 994(1), and Title 18, United States Code, Section 3553. The parties acknowledge that the sentencing guidelines are advisory and one of the factors the Court must consider in imposing sentence. The defendant agrees and consents that facts that determine the offense level will be found by the

Court, by a preponderance of the evidence, and that the Court may consider and use any reliable evidence, including hearsay and the facts outlined in the Presentence Report. The parties further agree that the stipulation of facts in this plea agreement will also be used by the Court in determining the sentencing guideline range.

The parties provide the following estimated guideline range for the Court's consideration pursuant to 18 U.S.C. § 3553(a)(4).

The parties understand that the Court may impose any sentence, up to the statutory maximum, regardless of any advisory guideline range computed, and that the Court is not bound by any position of the parties. § 6B1.4(d). The Court is free, pursuant to §§ 6A1.3 and 6B1.4, to reach its own findings of facts and sentencing factors considering the parties' stipulations, the presentence investigation, and any other relevant information. § 6B1.4 Comm.; § 1B1.4.

To the extent the parties disagree about the estimated guideline sentencing factors, the computations below identify the factors which are in dispute. § 6B1.4(b).

**Offense Level**: The parties agree that the applicable base guideline is § 2G1.3.[2]

A. The base offense level for this offense is **24**. § 2G1.3(a)(4).

B. Because the offense involves the use of a computer to entice, encourage, offer, or solicit a person to engage in prohibited sexual conduct with the minor, increase by **+2** levels. § 2G1.3(b)(3).

C. Because the offense involved a minor who had not attached the age of 12 years, increase by **+8** levels. §2G1.3(b)(5).

D. Because the offense involved more than one minor under the age of 12, increase the offense level by **+2** levels. § 2G1.3(d)(1); § 3D1.4.

E. No victim-related, role-in-offense, or obstruction adjustments apply.

---

[2] There is a cross reference provision to USSG § 2A3.1; however, it only applies if the adjusted offense level is higher. Since the calculation appears to be the same under either provision, the parties agree § 2G1.3 is more appropriately applied since it more accurately captures defendant's conduct.

F.  Defendant should receive a decrease in the offense level by -2 based upon his acceptance of responsibility.  § 3E1.1(a).  Defendant should also receive a decrease in the offense level by –1 for timely notifying the government.  § 3E1.1(b).  At sentencing, the government will make the appropriate motion for the one-point reduction.

G.  The adjusted offense level is **33**.

### Criminal History Category

H.  The parties acknowledge and agree that the estimation regarding Defendant's criminal history is tentative.  Defendant acknowledges that the criminal history will be further investigated by the United States Probation Department and ultimately determined by the Court.  Defendant further acknowledges that any additional facts regarding the criminal history can greatly affect the final guideline range and result in a longer term of imprisonment.  Based upon the facts known at this time regarding Defendant's criminal history, the parties believe that Defendant falls within Criminal History Category ("CHC") **I**.  § 4A1.1.

I.  The career offender and repeat and dangerous sex offender adjustments tentatively do not apply.  § 4B1.1; § 4B1.5.

### Guideline Ranges

J.  The guideline range resulting from the estimated offense level of 33 and the estimated criminal history category of I is **135** to **168** months.  However, the imprisonment range could be from 135 months (bottom of CHC I) to 293 months (top of CHC VI).

K.  Pursuant to § 5E1.2, assuming the estimated offense level of 33, the fine range for this offense would be $17,500 to $175,000, plus applicable interest and penalties.

L.  Pursuant to 18 U.S.C. § 3583(k), and § 5D1.2(b)(2), if the Court imposes the term of supervised release, that term shall be at least 5 years but not more than life.

### VI.  WHY THE PROPOSED PLEA DISPOSITION IS APPROPRIATE

The parties believe the advisory sentencing range resulting from the proposed plea agreement is appropriately calculated because all relevant conduct is disclosed, the sentencing

guidelines take into account all pertinent guidelines sentencing factors with respect to this defendant, and the charges to which the defendant has agreed to plead guilty adequately reflect the seriousness of the actual offense behavior.

This document states the parties' entire agreement. There are no other promises, agreements, side agreements, terms, conditions, understandings or assurances, express or implied. In entering this agreement, neither the government nor the defendant have relied, or are relying, on any terms, promises, conditions or assurances not expressly stated in this agreement.

Date: 10-27-11

_____
GEORGIOS SGOUROS
Defendant

Date: 10-27-11

_____
Thomas E. Goodreid
Attorney for Defendant

Date: 11/30/11

_____
Judith A. Smith
Assistant U.S. Attorney